# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                    No. CR 08-0784 JB

ESMERALDA ALFARO,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Statement and Memorandum in Support Thereof, filed June 12, 2008 (Doc. 90)("Motion to Suppress").  The Court held an evidentiary hearing on December 4, 2008.  The primary issues are: (I) whether Alfaro had the right to the assistance of counsel and the right to remain silent; (ii) whether Alfaro invoked her right to counsel; (iii) whether she voluntarily waived her right to counsel and her right to remain silent; and (v) whether she made the inculpatory statements involuntarily.  The Court finds that, while it need not decide whether Alfaro was in custody for purposes of determining whether Miranda warnings were mandatory, Miranda warnings were given, and Alfaro had the right to assistance of counsel and the right to remain silent.  The Court also finds that Alfaro did not make a clear, unambiguous request for an attorney.  Alfaro's statements to the officers following her acknowledgment that she understood her rights were made voluntarily.  The officers were therefore not required to stop questioning.  The Court will therefore deny the Motion to Suppress.

## FACTUAL BACKGROUND

This case involves a large methamphetamine trafficking organization in the Roswell, New Mexico area.  After one of the organization's members talked, investigating agents learned that one

member would pay Alfaro for the drugs.  The factual issue is whether, when the agents took Alfaro to the Federal Bureau of Investigation ("FBI") office in Roswell and gave her Miranda warnings, she voluntarily waived her right to an attorney before she made incriminating statements.

  1.  <u>January 11, 2008</u>.

  There are some facts that are helpful to understanding the background of this case which the parties did not introduce into evidence at the evidentiary hearing.  The United States and Alfaro set those facts forth in their briefing, but the Court does not believe it has sufficient evidence in the record to make them Findings of Fact, nor does it believe that it is necessary for the Court to make Findings why law enforcement came to suspect Alfaro.  Thus, this factual information is set forth here primarily for informational purposes.

  On January 11, 2008, a Confidential Informant ("CI") advised law-enforcement agents in Roswell that co-Defendant Reynaldo Duarte was selling methamphetamine for co-Defendant Emiliano Moises Orona who was, in turn, selling for co-Defendant Ignacio "Nacho" Villalobos. United States' Response to Defendant's Motion to Suppress at 1, filed July 9, 2008 (Doc. 104)("Response"); Transcript of Hearing at 4:9-13 (taken December 4, 2008)(Nevala).[1]  At approximately 12:10 p.m. that day, the CI made a recorded, controlled purchase of approximately one ounce of methamphetamine from Duarte at Duarte's residence, located in Roswell.  <u>See</u> Tr. at 9:13-16 (Nevala); Response at 1.   During the controlled buy, the CI sent a text message to the agents stating that "Mo" was going to deliver the methamphetamine.  <u>See</u> Response at 1-2. Surveillance agents then observed Orona arrive at, and then leave, Duarte's residence.  <u>See</u> <u>id.</u> at 2.

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

After the CI made the purchase, he told agents that, when he walked into the house, he encountered Duarte, who collected the $1,250.00, which was to be the purchase price of the ounce of methamphetamine.  See id.  Duarte then told the CI that he did not have the methamphetamine at this house and that he was going to call "Mo" to have it delivered.  See id.  Duarte then called "Mo."  Id.  A few minutes later, Orona arrived at the residence and parked outside.  See id.  Duarte then walked outside to give the money to Orona and to get the methamphetamine.  See id.  Duarte then came back in and gave the ounce of methamphetamine to the CI.  See id.

Later the same day, at approximately 4:00 p.m., the CI returned to Duarte's house and made another recorded, controlled purchase of approximately three ounces of methamphetamine.  See id.  Once again, the CI entered the residence where Duarte had told him that "Mo" would be delivering the methamphetamine.  See id.  Agents then observed Orona arrive at, and then leave, Duarte's residence.  See id.  The CI later advised that, when he entered the residence, he encountered Duarte, who collected the $3,800.00 –  the price of the methamphetamine – from him.  See id.  Duarte then made a telephone call to "Mo" and asked him to deliver the methamphetamine.  Id.  A few minutes later, Orona arrived and met with Duarte outside the house.  See id.  Duarte then came back inside and handed the CI a sock containing three ounces of methamphetamine.  See id.

Later that evening, agents approached Orona and advised him of his Miranda rights.  See Response at 2.  Orona waived his rights and agreed to make a statement.  See id.  Orona told the agents that, for the past two years, he had been selling methamphetamine for Villalobos.  See id.  Orona stated that Villalobos was the head of a large drug-trafficking organization and that, every time Orona needed methamphetamine to sell, he would contact Villalobos to order methamphetamine.  See id.  Orona stated that Villalobos would then instruct Alfaro to deliver five to eight ounces of methamphetamine to Orona, and Orona would pay Alfaro for the drugs.  See id.

at 3.

Based on Orona's statements, Alfaro became a person of interest, and law enforcement officers approached her on January 14, 2008 to conduct the questioning that is at issue on this motion.

2. **Findings of Fact**.

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 12(d). The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to search. See United States v. Merritt, 695 F.2d 1263, 1270 (10th Cir. 1982) cert. denied, 461 U.S. 916 (1983). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 1101(d)(1). Thus, the Court may consider hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269.

1. On January 14, 2008, FBI Agent Zane Nevala and Chaves County Metro Narcotics Agent Eric Brackeen approached Alfaro's residence in an attempt to make contact with her regarding the ongoing narcotics investigation. See Tr. at 5:13-16 (Camacho, Nevala).

2. Both agents were wearing plain clothes and did not have any visible firearms. See Tr. at 5:23-24, 6:4 (Nevala).

3. When the officers knocked on the door of Alfaro's residence, nobody answered. See Tr. at 6:13-15 (Nevala).

-4-

4.      After waiting a few moments at the door, the officers were preparing to leave when the decided to talk with one of Alfaro's neighbors.  See Tr. at 6:11-25 (Nevala).

5.      The neighbor told the officers that Alfaro was probably home, because her car was present.  See Tr. at 6:18 (Nevala).

6.      Based on what the neighbor told them, the officers returned to Alfaro's house and knocked on the door.  See Tr. at 6:18-19 (Nevala).

7.      After a few more minutes, the officers received no response, and were preparing to leave, when they spoke with the neighbor again.  See Tr. at 6:20-25 (Nevala).

8.      The neighbor advised the officers that Alfaro was probably at her mother's house located just down the street.  See Tr. at 6:20-25 (Nevala).

9.      The neighbor also advised that, when contacted by the agents, Alfaro would pretend that she does not speak or understand English.  See Tr. at 6:25-7:4 (Nevala).

10.      The agents then approached Alfaro at her sister's house.  See Tr. at 7:15-8:1 (Nevala); id. at 70:8-15 (Sedillo, Alfaro).[2]

11.      An older lady answered the door, and when the officers asked her if Alfaro was there, the lady said that she was and went to retrieve her.  See Tr. at 7:19-20 (Nevala).[3]

---

[2]  Alfaro has referred to the house as her sister's house, while the officers have referred to the house as her mother's.  Alfaro testified, however, that her mother also lives there.  See Tr. at 70:12-18 (Alfaro).  The Court sees no reason to disbelieve Alfaro on this point.

[3] It is unclear from the evidence who answered the door.  While the officers testified that an older lady came to the door, Alfaro insists that it could not have been her mother, because a brain aneurism rendered her mother unable to speak.  See Tr. at 71:3 (Alfaro).  Agent Nevala testified that the lady that greeted the officers at the door spoke to them.  Consequently, if the Court credits Alfaro's testimony that her mother cannot speak, it is unlikely that her mother was the one who answered the door.  Alfaro also testified, however, that her sister, while older, could not have been the one who answered the door.  See Tr. at 70:23-24.  Ultimately, Alfaro testified that she does not know who answered the door.  See id. at 70:20.  Although the identity of the person who answered

12.     The agents advised Alfaro that she was not under arrest and that they wanted to speak to Alfaro regarding an ongoing narcotics investigation.  See Tr. at 7:25-8:1 (Nevala).

13.     When the agents first contacted Alfaro, she acted liked she did not understand English.  See Tr. at 8:2-3 (Nevala).

14.     Nevala then told Alfaro what the neighbor said, and she smiled and then spoke English to the agents.  See Tr. at 8:3-5 (Nevala).

15.     The agents again instructed Alfaro that she was not under arrest.  See Tr. at 23:21 (Nevala).

16.     Alfaro agreed to speak to the agents.  See Tr. at 8:23 (Nevala).

17.     The agents then asked Alfaro if she would voluntarily accompany them to the FBI office in Roswell to speak with them.  See Tr. at 8:18-22 (Nevala).

18.     Alfaro agreed to accompany the agents and to speak with them.  See Tr. at 9:1 (Nevala).[4]

---

the door is not determinative to the Court's analysis, the confusion surrounding Alfaro's account contributes to the Court's skepticism about some of Alfaro's key testimony.  It is apparent that someone answered the door and then told Alfaro that she was wanted at the door.  Alfaro, who is in the best position to know the identities of those in the house with her, and of the person that alerted her of the officers' presence, has obfuscated rather than clarified this fact.  This pattern of clouding rather than clarifying certain relatively minor facts has made it difficult for the Court to believe Alfaro's testimony on more important factual disputes.

[4] Alfaro's version of the initial contact between her and the officers, as reflected in Findings of Fact 7-13, differs in some respects from that of the officers.  Alfaro testified at the evidentiary hearing that she did not understand what the agents were saying because she does not speak English and that she felt that she had to go with them.  See Tr. at 71:17-72:12 (Alfaro, Sedillo).  Nevala testified that Alfaro feigned not understanding English on more than one occasion, see Tr. at 8:2-3 (Nevala), 12:10-13 (Nevala), and that the officers had some basic conversations with her without the aid of an interpreter.  Because Alfaro said she did not understand English, but admits that she understands some, the Court finds Officer Nevala's testimony regarding the initial contact to be credible.

19.     The agents advised Alfaro that she did not have to speak with them, or to accompany them to the office, if she did not wish to do so.  See Tr. at 8:18-25 (Nevala).

20.     Alfaro again agreed to go with the agents.  See Tr. at 32:3-4 (Camacho, Nevala).

21.     Alfaro briefly went back into the house to tell her mother she had to go somewhere. See Tr. at 87:11-12 (Alfaro).

22.     Alfaro took her cellular telephone with her to the FBI office.  See Tr. at 115:7-9 (Camacho, Brackeen).[5]

23.     The officers did not forbid Alfaro from retrieving or taking any personal belongings to the FBI office or restrict what she could take.  See Tr. at 115:1-19 (Camacho, Brackeen).

24.     Alfaro was then transported in the front seat, without any restraints, to the FBI office. See Tr. at 9:4-5 (Camacho, Nevala), 73:23-24 (Alfaro).

25.     The FBI office in Roswell is housed in a bank building.  See Tr. at 9:9-14 (Camacho, Nevala).

26.     The FBI office looks like a normal office.  See Tr. at 9:23-10:5 (Nevala).

_____

[5] Alfaro testified that she did not take her cellular telephone or her purse with her to the FBI office.  See Tr. at 72:14-15 (Sedillo, Alfaro); id. at 87:15-17 (Camacho, Alfaro); id. at 88:12-13 (Sedillo, Alfaro).  Nevala also testified that he did not believe she brought her purse or telephone with her.  See id. at 21:17-18 (Camacho, Nevala).  Another officer, however, testified that Alfaro had her telephone and that she used it during the interview on January 14, 2008 to attempt to call Villalobos, in cooperation with the officers.  See id. at 115:13-16 (Brackeen).  Alfaro has not been credible on certain facts, and, while Nevala's testimony corroborates her contention that she did not have her telephone, he was not firm on that part.  The Court believes it is more likely that she had it with her.  Brackeen was more definitive on that fact.  Benavides testified that Alfaro consented to make two calls to Villalobos while she was at the FBI office on January 14, 2008.  See id. at 48:2-4 (Benavides); id. at 49:16-21.  While Benavides did not testify whose telephone Alfaro used, it appears likely that they would have had her use her own telephone to avoid raising suspicions and the need to explaining why she was calling Villalobos from a strange number.  The Court, however, believes that Alfaro most likely did not have her purse with her, given that none of the officers could testify with certainty that she had her purse with her.

27.    The FBI office does not contain any holding cells or have an outward appearance of being a place where someone would be detained.  See Tr. at 11:22-25 (Camacho, Nevala).

28.    The officers took Alfaro to a break room to conduct their interview with her.  See Tr. at 10:4-8 (Nevala, Camacho), 73:10 (Alfaro).

29.    The break room was furnished with a television and a refrigerator stocked with snacks.  See Tr. at 10:4-8 (Nevala, Camacho); 46:23-24 (Benavides).

30.    None of the officers threatened or handcuffed Alfaro when she was taken to the FBI office.  See Tr. at 91:1-5 (Camacho, Alfaro),

31.    When the agents arrived at the FBI office with Alfaro, she again acted like that she did not understand English.  See Tr. at 12:10-13 (Nevala).[6]

32.    Nevala asked Alfaro if she would be more comfortable with a Spanish translator.  See Tr. at 12:14-15 (Nevala), 92:17-23 (Camacho, Alfaro).

33.    Alfaro advised that she would prefer a Spanish translator.  See Tr. at 12:16 (Nevala).

34.    Nevala then contacted Special Agent Fernando Benavides and requested that he translate the interview.  See Tr. at 12:17-18 (Nevala), 92:17-23 (Camacho, Alfaro).

35.    Alfaro was offered food and beverages as the agents waited for Benavides to arrive to conduct the interview.  See Tr. at 10:21-24 (Nevala), 91:9-10 (Camacho, Alfaro).

36.    Benavides, who is a native Spanish speaker, arrived between fifteen and thirty minutes later, and spoke with Alfaro in Spanish.  See Tr. at 13:9-11 (Nevala); 38:14-25 (Camacho, Benavides); 73:18 (Alfaro).

---

[6] Alfaro maintained in her testimony that she did not understand the officers when they spoke in English.  See Tr. at 73:10-13 (Alfaro).  The Court believes that Alfaro understands basic English and that she feigns not understanding when she feels it expedient to do so.

37.     Benavides was dressed in plain clothes and did not have a firearm visible.  <u>See</u> Tr. at 39:5-14 (Benavides, Camacho).

38.     Benavides advised Alfaro in Spanish that the agents wished to ask her questions and that, if she were willing to speak with them, Benavides would serve as an interpreter.  <u>See</u> Tr. at 39:24-40:1 (Benavides).

39.     Before beginning any questioning, Benavides verbally translated a FD-395, Advice of Rights, from English to Spanish.  <u>See</u> Tr. at 14:3-5 (Nevala), 40:14-15 (Benavides).

40.     Benavides then asked Alfaro if she understood her rights, and she stated that she understood her rights.  <u>See</u> Tr. at 54:4-5 (Benavides).[7]

41.     Alfaro did not sign a written waiver of her <u>Miranda</u> rights because she was not offered a Spanish version to sign.  <u>See</u> Tr. at 42:17-20 (Benavides).

42.     Alfaro asked Benavides if she was under arrest or if she needed an attorney.  <u>See</u> Tr. at 40:18, 21-22 (Benavides).

43.     Alfaro was informed that she was not under arrest and that she was the only one who could decide if she wanted to request an attorney.  <u>See</u> Tr. at 40:21, 41:1-3 (Benavides).[8]

---

[7] Alfaro testified that she did not remember whether Benavides read her the Advice of Rights before interviewing her.  <u>See</u> Tr. at 93:11-16 (Camacho, Alfaro).  The failure of memory on this important fact undermines her credibility.  Accordingly, the Court believes Benavides' testimony that he read the Advice of Rights to her in Spanish before he began his interview with her.

[8] Alfaro's testimony regarding the interview with Benavides, and whether she agreed to speak without an attorney, differs from Benavides' version.  She testifies that she expressly requested an attorney, and that when she did, Benavides pulled out his handcuffs and laid them threateningly on the table in front of her.  <u>See</u> Tr. at 93:17-25 (Camacho, Alfaro).  The officers denied that Benavides pulled out his handcuffs or threatened Alfaro.  <u>See</u> <u>id.</u> at 56:24-57:10 (Benavides); <u>id.</u> at 33:6-12 (Nevala) The Court finds Benavides' testimony to be more credible than Alfaro's.  The Court does not believe that Benavides or any of the other officers threatened Alfaro.

44.     Alfaro never asked for an attorney.  <u>See</u> Tr. at 40:21, 41:1-3 (Benavides).

45.     Benavides did not pull his handcuffs or threaten Alfaro.  <u>See</u> Tr. at 56:24-57:10 (Benavides).

46.     After a few moments, Alfaro agreed to answer the agents' questions without a lawyer present.  <u>See</u> Tr. at 41:5-6 (Benavides).

47.     During the questioning, Alfaro began responding without the aid of the Spanish interpreter.  <u>See</u> Tr. at 14:11-17 (Nevala); <u>id.</u> at 116:25 (Brackeen).

48.     Alfaro stated that she considers herself to be Villalobos' sister-in-law.  <u>See</u> Tr. at 44:13 (Benavides).

49.     Alfaro advised the agents that she had daily contact with Villalobos.  <u>See</u> Tr. at 44:20 (Benavides).

50.     Alfaro stated that she has never seen Villalobos with any drugs on his person nor at his home.  <u>See</u> Tr. at 44:22 (Benavides).

51.     Alfaro occasionally cleans Villalobos' home and runs errands for him.  <u>See</u> Tr. at 44:16-17 (Benavides).

52.     The officers then told Alfaro that Villalobos' son-in-law, Orona, a.k.a. Moe Orona, had confessed to distributing drugs for Villalobos and had identified Alfaro as the person who delivers half a pound of methamphetamine on a weekly basis or every ten days to Orona at his home in Roswell.  <u>See</u> Tr. at 45:3-10 (Benavides).

53.     Alfaro made a statement in Spanish, which, in English translates to: "One does not know what one is getting into until it's too late."  <u>See</u> Tr. at 45:12-16 (Benavides).[9]

_____

[9] Although it was not introduced at the evidentiary hearing, in Spanish, Alfaro stated: "Uno no sabe a lo que se esta metiendo hasta que ya es muy tarde."  Response at 5.

54.     Alfaro then admitted that she knows that Villalobos is a trafficker and distributor of methamphetamine and that she had been delivering methamphetamine to Orona on behalf of Villalobos.  See Tr. at 45:16-18 (Benavides).

55.     During the interview process, the agents did not threaten, or raise their voices at Alfaro.  See Tr. at 42:24-44:1 (Benavides, Camacho).

56.     Officer Nevala was within earshot of the interview at all times, even when he was not actively participating.  See Tr. at 33:6-8 (Nevala).

57.     Alfaro was permitted to use the restroom unaccompanied twice during the time the agents were interviewing her.  See Tr. at 46:15-20 (Camacho, Benavides); id. at 36:11-14 (Sedillo, Nevala).[10]

58.     The officers never refused Alfaro's requests to use the restroom.  See Tr. at 91:19-20 (Camacho, Alfaro),

59.     Alfaro spent approximately two hours at the FBI headquarters, including the fifteen to thirty-minute wait for Benavides and the hour and twenty minutes she spent in questioning after Benavides arrived.  See Tr. at 59:13-14 (Benavides); id. at 14:24-15:2 (Nevala).[11]

60.     The agents allowed Alfaro to use the telephone when Alfaro asked to do so.  See Tr. at 91:14-15 (Camacho, Alfaro).

---

[10] Alfaro testified that she was allowed to use the bathroom once, and that an officer accompanied her and stood outside the door while she was in the bathroom.  See Tr. at 91:22-92:3 (Camacho, Alfaro).  Benavides and Nevala testified that Alfaro used the bathroom twice.  See Tr. at 46:15-20; id. at 36:11-14 (Sedillo, Nevala). Given that Alfaro undermined her credibility during the evidentiary hearing on certain points, the Court credits the officers' testimony that she was allowed to use the bathroom unaccompanied twice.

[11] Alfaro testified that she was at the FBI office for "quite a bit of time."  Tr. at 78:8-10 (Alfaro).  She also testified that she did not arrive home until 9:30 P.M.  See id. at 78:22 (Alfaro).

61.     At some point during the interview, Alfaro asked the agents to take her home so that she could attend a party that evening, and the agents complied with her request.  See Tr. at 16:4-6 (Nevala), 95:10-17 (Camacho, Alfaro).  .

62.     At Alfaro's request, the agents dropped her off within a few blocks of where they originally picked her up.  See Tr. at 30:13-16 (Nevala).[12]

### 3.     The Incriminating Statements.

During her questioning, Alfaro made the incriminating statements that she now seeks to suppress.  The statements that Alfaro seeks to suppress include: (I) the explanation she gave about how she knew Villalobos, the nature of her relationship with him, and that she considered him to be her brother-in-law, performed errands for him, and had frequent contact with him; (ii) her statement, in Spanish, that "uno no sabe a lo que se esta metiendo hasta que ya es muy tarde," which, in English, translates as: "one does not know what he or she is getting into until it's too late," see Response at 5; (iii) her admissions that she knew Villalobos was a trafficker and distributer of methamphetamine, and that he employed her as a distributer; (iv) her statement that she had delivered a box containing methamphetamine to Orona every week to ten days for the past year; (v) details about how she became involved as a distributor for Villalobos; and (vi) details about how she would carry out her deliveries and receive payment from Villalobos.  See Response at 5-7.  The United States has represented that Alfaro did not make incriminating statements before the agents gave Alfaro the Miranda warnings.  See Tr. at 144:15-19 (Court, Camacho).

---

[12] Alfaro disputes that she requested to be dropped off a few blocks away from her mother's house.  See Tr. at 96:1-9 (Camacho, Alfaro).  The Court credits the officer's testimony that Alfaro wished to be dropped off out of sight of the house at her own request, because it is likely that she did not want to be seen being dropped off by law enforcement officers.  See id. at 30:13-16 (Nevala).

**PROCEDURAL BACKGROUND**

Alfaro was charged by criminal complaint with knowingly and intentionally conspiring to possess with intent to distribute approximately twelve pounds or more of methamphetamine, in violation of 21 U.S.C. §§ 841 & 846.  See Criminal Complaint, filed January 23, 2008 (Doc. 1).  On June 12, 2008, Alfaro filed this Motion to Suppress, pursuant to rule 12(b) of the Federal Rules of Criminal Procedure, asking the Court to suppress statements obtained from her in violation of Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), and the Fifth and Fourteenth Amendments to the United States Constitution.  See Motion to Suppress at 1.

The Court held an evidentiary hearing on December 4, 2008, at which Agent Nevala, Agent Benavides, Officer Brackeen, Alfaro, and Tim Cannon, who was one of Alfaro's ex-employers, testified.  See Tr. at 3:4 (Camacho); id. at 37:9-10 (Camacho); id. at 64:11 (Sedillo); id. at 68:5-6 (Sedillo); id. at 100:4-5 (Camacho).  At the hearing, Alfaro conceded that a waiver of the Miranda rights does not have to be in writing to be valid.  See id. at 148:1-3 (Court, Sedillo).  Alfaro argued, however, that – factually – she did not waive her rights and that she requested an attorney.  See id. at 148:10-19.  She also stated that, while she agreed with the Court that the key issue is whether Alfaro requested an attorney, and not whether she was in custody, she also believed that the facts regarding whether the interview was custodial are relevant to whether her statements were voluntary. See id. at 149:1-3 (Court, Sedillo).  At the suppression hearing, the parties presented considerable evidence on whether Alfaro was in custody.  At the end of the hearing, however, the Court queried both defense counsel and the United States whether a finding of custody was relevant.  See Tr. at 145:1-3 (Court).

The United States stated that it was inclined to believe that, once Benavides read the Miranda warnings to Alfaro, she had those rights.  See Tr. at 142:18-25 (Court, Camacho).  The United States

-13-

also noted its "gut reaction" that, if Alfaro had requested an attorney during the course of her questioning at the FBI office, the officers would have been obligated to stop questioning until she had an attorney, even if the situation was not custodial.  See id. at 143:23-24 (Camacho).  Alfaro maintained that whether she was in custody was relevant to whether her statements were voluntary. See id. at 149:1-3 (Court, Sedillo).

## RELEVANT LAW REGARDING MIRANDA RIGHTS

Law enforcement officials must give the Miranda warnings to a person subject to "custodial interrogation."  United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing Miranda v. Arizona, 384 U.S. at 444)(internal quotations omitted).  A person is in custody if "his freedom of action is curtailed to a degree associated with formal arrest."  Id. (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984))(internal quotations omitted).  The court must examine "whether a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest."  Id. (brackets in original)(internal quotations and citations omitted).

The Tenth Circuit has articulated the "[t]wo discrete inquiries . . . essential to the determination" of custody: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  United States v. Erving L., 147 F.3d 1240, 1245 (10th Cir. 1998).

### 1.    Custodial Setting.

The Supreme Court has described the determination whether a suspect is "in custody" as a "mixed question of law and fact."  Thompson v. Keohane, 516 U.S. 99, 101 (1995).  Because of its nature as a mixed question, and because "[t]he Miranda decision did not provide the Court with an opportunity to apply that [custody] test to a set of facts,"  Yarborough v. Alvarado, 541 U.S. 652,

661 (2004), the resolution of this question requires a case-by-case analysis.  See Yarborough v. Alvarado, 541 U.S. at 664-65 (outlining factors for and against a custody determination).

In reaching a conclusion, the underlying emphasis is always on the degree to which the suspects' freedom has been curtailed.  See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) ("Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.  Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'").

Courts employ an objective test in making custody determinations, and therefore "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkermer v. McCarty, 468 U.S. at 442.  See Stansbury v. California, 511 U.S. 318, 323 ( 1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").  The Supreme Court has indicated that it favors an objective test, as opposed to a subjective test, because an objective test "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question." Berkermer v. McCarty, 468 U.S. at 442, n.35 (quoting People v. P., 21 N.Y.2d 1, 9-10, 233 N.E.2d 255, 260 (1967)).

Pursuant to this understanding, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have held that an individual is not "in custody" for Miranda purposes simply because the individual is the target of an investigation or a suspect in a crime.  See, e.g., Stansbury v. California, 511 U.S. at 319 ("We hold, not for the first time, that an officer's subjective

and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody."); United States v. Leach, 749 F.2d 592, 599-600 (10th Cir. 1984) (refusing to classify defendant as "in custody" merely because he was the target of a counterfeit note investigation).  For an individual's status as a suspect to be relevant, the questioning officer must convey his knowledge or belief with regard to that status, by word or deed, in such a manner as to "affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'"  Stansbury v. California, 511 U.S. at 325.

       **2.**      **Custodial Interrogation.**

      A finding of custody, by itself, does not make a statement inadmissible.  The Supreme Court in Miranda v. Arizona specifically preserved the propriety of confessions in American law enforcement and stated:  "Any statement given freely and voluntarily without compelling influences is, of course, admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."  Miranda v. Arizona, 384 U.S. at 478.  Accordingly, custodial statements are only inadmissible when they are improperly compelled or coerced through either "express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  In other words, it is not custody that requires Miranda protections, but rather custodial interrogation.  See id. at 300 ("'Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

      It is well settled that "any criminal trial use against a defendant of his involuntary statement is a denial of due process of law."  Mincey v. Arizona, 437 U.S. 385, 398 (1978) (emphasis in original).  While some statements procured while a defendant is in custody may be the product of

-16-

involuntary coercion, many are attributable to other factors.  See Culombe v. Connecticut, 367 U.S. 568, 576 (1961) ("[A] confession made by a person in custody is not always the result of an overborne will.  The police may be midwife to a declaration naturally born of remorse, or relief, or desperation, or calculation.").  Similar to the custody test, the determination whether a statement is voluntary or involuntary involves a totality-of-the-circumstances approach requiring "more than a mere color-matching of cases."  Mincey v. Arizona, 437 U.S. at 401 (quoting Reck v. Pate, 367 U.S. 433, 442 (1961)).  Rather, a determination of custody requires a "careful evaluation of all the circumstances of the interrogation."  Mincey v. Arizona, 437 U.S. at 401.

To assist the courts' efforts in determining whether a statement was voluntarily given, the Supreme Court has divided the analysis into three parts.  First, the court must compile the facts relevant to understanding the circumstances under which the confession was given.  See Culombe v. Connecticut, 367 U.S. at 603.  Among the facts the court must consider in this step are "the duration and conditions of detention (if the confessor has been detained), the manifest attitude of the police toward him, his physical and mental state, [and] the diverse pressures which sap or sustain his powers of resistance and self-control."[13]  Id. at 602.  Second, the court must evaluate how the accused reacted to these underlying circumstances.  See id. at 603.  Third, the court must determine

---

[13] The Tenth Circuit has recently enumerated its own list of facts relevant to a determination whether a statement was voluntarily made.  In United States v. Lopez, 437 F.3d 1059 (10th Cir. 2006), the Tenth Circuit stated:

Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation.  Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.

Id. at 1063-64 (quoting United States v. Toles, 297 F.3d 959, 966 (10th Cir. 2002)).

the legal significance of the accused's reaction to the circumstances.  See id.  With reference to the

second and third parts of the analysis, the Supreme Court has acknowledged that, "although distinct

as a matter of abstract analysis, [parts two and three] become in practical operation inextricably

interwoven."  Id. at 604.

### 3.    Requests for an Attorney.

The Fifth and Fourteenth Amendments to the United States Constitution provide the accused

a "right to have counsel present during custodial interrogation."  Edwards v. Arizona, 451 U.S. 477,

481 (1981).  Once an individual subject to custodial interrogation expresses a desire for counsel, that

individual is "not subject to further interrogation by the authorities until counsel has been made

available to him, unless the accused himself initiates further communication, exchanges, or

conversations with the police."  451 U.S. at 484-85.  The Supreme Court of the United States in

Miranda v. Arizona stated:

> If the individual states that he wants an attorney, the interrogation must cease until
> an attorney is present. At that time, the individual must have an opportunity to confer
> with the attorney and to have him present during any subsequent questioning. If the
> individual cannot obtain an attorney and he indicates that he wants one before
> speaking to police, they must respect his decision to remain silent.

384 U.S. at 474.

The request for counsel must be clear and unequivocal.  See Davis v. United States, 512 U.S.

452, 459 (1994).  "Invocation of the Miranda right to counsel 'requires, at a minimum, some

statement that can reasonably be construed to be an expression of a desire for the assistance of an

attorney.'"  Id. at 459 (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).

The applicability of the rule that law enforcement cease custodial interrogation upon a clear

request for counsel "requires courts to 'determine whether the accused actually invoked his right to

counsel.'"  Davis v. United States, 512 U.S. at 458 (citations omitted).  A court's inquiry into

-18-

whether the accused invoked the right to counsel is "objective."  An individual's "ambiguous" or "equivocal" references to an attorney, regarding which "a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel," do not give rise to an invocation of the right to counsel such that police must cease questioning.  <u>Id.</u> at 459.

In <u>United States v. Lux</u>, 905 F.2d 1379 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked "how long it would take if she wanted a lawyer and if she would have to stay in jail while she waited for a lawyer." 905 F.2d at 1382.  The Tenth Circuit, without elaborating on its reasoning, found that, based upon its "independent review" of the record, with deference to the trial court's findings of fact, the defendant did not make a request for an attorney.  <u>Id.</u>

## RELEVANT LAW REGARDING VOLUNTARINESS OF STATEMENTS

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  The Due Process Clause requires that, to be admissible, statements by a defendant must have been made voluntarily.  <u>See</u> <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000)("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.") (citing <u>Brown v. Mississippi</u>, 297 U.S. 278 (1936), and <u>Bram v. United States</u>, 168 U.S. 532, 542 (1897));  <u>Jackson v. Denno</u>, 378 U.S. 368, 376 (1964)("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, and even though there is ample evidence aside from the confession to support the conviction."

(citations omitted)).

The Supreme Court of the United States has declared that a defendant has the constitutional right "at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness." Jackson v. Denno, 378 U.S. at 376-77 (citation omitted). The United States must show that the statement was voluntary by a preponderance of the evidence. See Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004); Lego v. Twomey, 404 U.S. 477, 489 (1972)("[T]he prosecution must prove at least by a preponderance of the evidence that the confession was voluntary."); United States v. McCullah, 76 F.3d 1087, 1100 (10th Cir. 1996)("The prosecution has the burden of proving by at least a preponderance of evidence that the confession was voluntary." (citation omitted)), reh'g denied, 87 F.3d 1136 (10th Cir. 1996).

The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." Dickerson v. United States, 530 U.S. at 434 (internal quotations omitted)(quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The due process test takes into consideration the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." Id. (internal quotations omitted)(citations omitted). The Court must weigh "the circumstances of pressure against the power of resistance of the person confessing." Id. (internal quotations omitted)(quoting Stein v. New York, 346 U.S. 156, 185 (1953)). The Supreme Court has reaffirmed this analysis as recently as 2000. See id. ("We have never abandoned this due process jurisprudence, and thus continue to exclude confessions that were obtained involuntarily.").

The Supreme Court has instructed that, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. 157, 164 (1986). In reviewing

its cases in which it suppressed evidence, the Supreme Court has recognized that "all have contained a substantial element of coercive police conduct."  Id.

## ANALYSIS

The Court finds that it is not necessary to determine whether Alfaro was in custody, because, when the officers informed her she had a constitutional right to an attorney, she could reasonably assume that she, in fact, had that right.  Alfaro voluntarily waived her right to counsel.  Her question to Benavides whether she needed a lawyer did not constitute an invocation of the right to counsel that would have required the agents to cease their interrogation. Moreover, Alfaro's statements, which she made to law enforcement officers after hearing and understanding the Miranda warnings, were not the product of police coercion.  The facts and totality of the circumstances compel a finding that Alfaro made the statements voluntarily.

## I.   THE COURT WILL ASSUME THAT ALFARO DID NOT MAKE ANY INCRIMINATING STATEMENTS BEFORE THE AGENTS GAVE HER MIRANDA WARNINGS.

The United States represented that Alfaro did not make any incriminating statements before being read the Miranda rights.  See id. at 144:17-20 (Court, Camacho).  Alfaro did not dispute that fact, and neither she nor the United States offered evidence of any inculpatory statements made before the warnings were given.

Alfaro's testimony, fairly interpreted, is that she had only minimal communications with Nevala and Brackeen before Officer Benavides' arrival because she did not understand their English. For example, at the hearing, Alfaro testified that she did not speak English at any time with the agents – not even using short statements to answers simple questions.  See Tr. at 78:14-18 (Alfaro). Alfaro's testimony was internally contradictory, and she testified at another point that she did say some things in English.  See id. at 86:3 (Alfaro); id. at 88:22-89:5 (Alfaro).  The inconsistency has

undermined Alfaro's credibility.  Nevertheless, while the Court has not credited much of Alfaro's testimony that she did not understand what was happening or being said to her, the Court believes that, implicit in her testimony that did not understand English is an admission, on Alfaro's part, that she did not make incriminating statements to the officers before the interpreter arrived.  The Court will therefore assume that all of the statements at issue were made after Benavides gave her the warnings.  Accordingly, based on the record before the Court, the Court will assume that Alfaro made no inculpatory statements before the agents gave her <u>Miranda</u> warnings.

**II.   THE COURT NEED NOT DECIDE WHETHER ALFARO WAS IN CUSTODY.**

The United States argued in its brief and at the suppression hearing that the <u>Miranda</u> warnings were not required, because Alfaro was never in custody.  In light of the fact that the officers gave the <u>Miranda</u> rights before obtaining any statements, however, the Court is concerned that, regardless whether Alfaro was in custody, she had the <u>Miranda</u> rights after the officers advised her of those rights.

In its closing argument at the hearing, the United States stated that it was inclined to believe that, once Benavides read the <u>Miranda</u> warnings to Alfaro, she had the rights.  <u>See</u> Tr. at 142:18-25 (Court, Camacho).  The United States also noted its "gut reaction" that, if Alfaro had requested an attorney during the course of her questioning at the FBI office, the officers would have been obligated to stop questioning until she had an attorney, even if the situation was not custodial.  <u>See</u> <u>id.</u> at 143:23-24 (Camacho).

Upon independent review, the Court does not find any case law on point.  In one sense, police giving Miranda warnings does not confer the right to counsel and the right to remain silent; the Constitution grants or recognizes those rights.  <u>See</u> <u>Michigan v. Payne</u>, 412 U.S. 47, 54 (1973)("While [<u>Miranda v. Arizona</u> and  <u>North Carolina v. Pearce</u>, 395 U.S. 711 (1969)] created a

-22-

protective umbrella serving to enhance a constitutional guarantee, neither conferred a constitutional right that had not existed prior to those decisions."). "The right against use of an involuntary confession long preceded Miranda." Michigan v. Payne, 412 U.S. at 54. Custody may determine whether police have an obligation to give the warnings, but custody does not determine when a person has those rights. Each citizen has the right to counsel, and, with few exceptions, the right to remain silent, before being taken into custody. When police give Miranda warnings, they apprise a suspect of what he or she already has.[14] Moreover, it would be strange if the law allowed law enforcement to inform a suspect that she has a right to counsel, and then to later argue at the suppression hearing that she did not have that right. In other words, the Court believes that, when the officers advised Alfaro that she had a constitutional right to the assistance of counsel and not to answer their questions, Alfaro had the right to rely on their representation, regardless whether she was in a custodial interrogation, and thus legally entitled to the Miranda warnings.

Because the Court finds it unnecessary to decide whether Alfaro was in custody, the key remaining issues are: (I) whether she clearly and unequivocally requested a lawyer; (ii) whether Alfaro voluntarily waived her right to the assistance of counsel and her right to remain silent; and (iii) whether Alfaro's statements were voluntarily made. The Court finds (I) that Alfaro did not clearly and unequivocally request a lawyer; (ii) that she voluntarily waived her right to counsel and her right to remain silent; and (iii) that she voluntarily spoke with the officers. Specifically, the Court finds that her question whether she should obtain a lawyer was not a clear request for counsel

---

[14] Ms. Camacho states that she counsels FBI agents to give Miranda warnings early in the process to avoid arguments by defendants about whether they were subject to custodial interrogation. See Tr. at 144:1-9 (Camacho). If the Court were to find that the Miranda warnings were meaningless in the absence of custody, and if the Court were to conclude that the Miranda warnings confer rights, the Court would undermine the salutary goal of liberally giving the Miranda warnings.

such that the officers were required to cease questioning until a lawyer was present.

## III.   ALFARO DID NOT CLEARLY AND UNEQUIVOCALLY REQUEST A LAWYER.

A request for counsel must be clear and unequivocal.  See Davis v. United States, 512 U.S. at 459.

The suspect must make a clear statement that, "at a minimum, . . . can reasonably be construed to

be an expression of a desire for the assistance of an attorney."  Id. at 459 (quoting McNeil v.

Wisconsin, 501 U.S. 171, 178 (1991)).  The Court believes that Alfaro's inquiry whether she needed

an attorney did not constitute such a clear and unequivocal request.  When she met with Benavides,

Alfaro asked if she was under arrest or if she needed an attorney.  See Tr. at 40:18, 21-22

(Benavides).  Benavides informed Alfaro that she was not under arrest and that only she could make

the determination whether she needed a lawyer.  See id. at 40:21, 41:1-3 (Benavides).

This Court has previously found that a similar question was not a clear invocation of a desire

to have an attorney.  See United States v. Martinez, Slip Copy, 2006 WL 4079686 at *12

(D.N.M.)(finding that "an inquiry whether [a suspect] might need a lawyer, was not an unequivocal

expression of his desire to have an attorney present").  Moreover, the Tenth Circuit has upheld a

district court finding that a suspect's question "how long it would take if she wanted a lawyer and

if she would have to stay in jail while she waited for a lawyer" was not a clear unequivocal request

for an attorney.  United States v. Lux,  905 F.2d at 1382.  The Court believes that Alfaro's question

is less clear of a request for an attorney that the statement at issue in United States v. Lux.

A suspect must "actually invoke[] his right to counsel" before law enforcement officers are

required to cease questioning.  Smith v. Illinois, 469 U.S. 91, 94 (1984).  The rule articulated in

Davis v. United States that a request for an attorney be clear and unambiguous is objective, designed

to "avoid difficulties of proof and to provide guidance to officers conducting interrogations."  512

U.S. 459.  A question such as Alfaro's, whether one needs an attorney, is not an unambiguous signal

to law enforcement that a suspect is invoking the right to counsel.  The officers were therefore not required to cease questioning Alfaro.

## IV.   ALFARO VOLUNTARILY WAIVED HER RIGHT TO THE ASSISTANCE OF COUNSEL AND HER RIGHT TO REMAIN SILENT.

Even thought Alfaro did not sign a written form of waiver, she voluntarily waived her right to the assistance of counsel and her right to remain silent.  At the evidentiary hearing, Alfaro conceded that a written waiver is not required for an effective waiver.  Alfaro did not effectively invoke her right to counsel.  Moreover, after being advised of her rights, she voluntarily began to speak with the agents, advising them that she was ready to answer their questions.  There is no indication that the officers proceeded to question her after advising her of her rights and after she asked whether she needed counsel, and before she told the agents she was willing to answer their questions.  The Court credits Benavides' testimony that she expresses her willingness to talk after receiving the warnings.  In light of Benavides' testimony that she expressed her willingness to talk after receiving the warnings, the record reflects that Alfaro re-initiated the conversation after being advised of her rights by expressing her willingness and by answering the questions the agents' questions after a few moments of reflection.

## V.   ALFARO VOLUNTARILY MADE THE STATEMENTS AT ISSUE.

While Alfaro conceded that it was not necessary for the Court to decide whether she was in custody to determine whether she enjoyed the right to counsel and the right to remain silent, Alfaro nevertheless argues that whether she was in custody is relevant to the issue whether her statements were voluntarily made.  The Court agrees to a certain extent.  While determining whether a person is in custody and voluntariness are not the same issue, the analysis for both involves similar factors. While the Court need not decide whether she was in custody for purposes of giving Miranda

warnings, the United States must nonetheless prove by a preponderance of the evidence that Alfaro's statements were made voluntarily.  See Missouri v. Seibert, 542 U.S. at 608 n. 1.  The Tenth Circuit has stated that the relevant circumstances for determining the voluntariness of statements "embrace both the characteristics of the accused and the details of the interrogation."  United States v. Lopez, 437 F.3d at 1063.  The factors that the Tenth Circuit has articulated include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment."  Id. at 1063-64.  When the Court carefully considers these factors in Alfaro's case, they lead the Court to the conclusion that her statements were voluntarily made.

### A.   ALFARO IS MATURE AND INTELLIGENT ENOUGH TO UNDERSTAND THE EXPLANATION SHE RECEIVED OF HER RIGHTS.

Under the first factor, Alfaro is an adult, and no argument has been made that she is of lower intelligence or would have difficulty understanding her rights, as those rights were explained to her. Benavides testified that, before conducting any questioning, he read and explained the Miranda rights, and that she indicated that she understood those rights.  The Court observed Alfaro during the suppression hearing and found her to be perceptive and responsive to the questions asked of her. She demonstrated the capacity to recall past events and, overall, did not give the impression that she suffered any deficiency in her ability to understand or assess her surroundings.

While Alfaro might have some deficiency in speaking and understanding English, she had sufficient ability to comprehend the initial, basic conversations she had with Nevala and Brackeen. Although Alfaro tried to give the impression, upon first meeting the law enforcement officers, that she did not understand English, after further inquiry, the officers discovered that she had basic

conversational capacity and understood what the officers were saying to her.  Her difficulties with English therefore did not impede her from realizing why the law enforcement officers were contacting her.

The key factual issue is whether she understood that she was not under arrest and did not have to go with Agent Nevala and Officer Brackeen to the FBI office.  The Court concludes that she did.  First, the record reflects that Alfaro understands some English.  What Nevala stated to Alfaro repeatedly consisted of single concepts, involving common English words, and did not complex or abstract ideas.  She did not ask Nevala or Brackeen to repeat themselves.  The officers' testimony, which the Court finds to be more credible than Alfaro's, reflects that she was conversing with them in English at times, and that she understood what was happening and what they were saying.  Under those circumstances, she voluntarily left with Nevala and Brackeen.  The Court believes she understood that she was not under arrest, that she knew that she did not have to go with Nevala and Brackeen, and that she made a conscious decision to do so.  Alfaro is deceptive.  She pretends not to speak English when she speaks some.  She also undermined her credibility at the evidentiary hearing on several aspects of her testimony.  Accordingly, the Court credits the officers' testimony, and not hers, on whether she understood that she was not under arrest and that she did not have to accompany the officers to the FBI office.  The Court also concludes that she went voluntarily and knew she did not have to go.  She also understood the officers' explanation that she was not under arrest and that she did not have to talk with them.

Benavides testified that, when asked whether she understood her rights as they were being explained to her, she indicated that she understood.  See Tr. at 54:4-5 (Benavides).  Most of the questioning that Alfaro underwent was conducted with the aid of a Spanish interpreter.  Benavides testified that he is a native speaker of Spanish.  See id. at 38:14-25 (Camacho, Benavides).  The key

portions of her incriminating statements appear to have been made through Benavides, and in Spanish, and not in English.

The Court concludes that Alfaro is sufficiently intelligent, and had the mental capacity to understand her situation.  The Court also concludes that any difficulty that she had in English did not prevent her from understanding key statements by the agents.  In sum, the Court concludes that she understood what was said to her.

**B.     THE QUESTIONING THAT ALFARO UNDERWENT WAS RELATIVELY SHORT AND SHE WAS FREE TO LEAVE WHEN SHE WISHED.**

The period of questioning which Alfaro underwent was relatively short.  Crediting the law enforcement officers' longer estimates of how much time passed, it appears that Alfaro spent approximately two hours at the FBI office.  She was not under constant questioning during that time and was allowed to use the restroom twice.  This Court has previously found that, where a suspect was held for five hours and subject to two hours in questioning, the length of the questioning and detention did not counsel a finding that the suspect's statements were made involuntarily.  See United States v. Martinez, Slip Copy, 2006 WL 4079686 at *14 ( D.N.M.).  The officers took much less time with Alfaro than the officers in United States v. Martinez, given that Alfaro spent only approximately two hours with the law enforcement officers.

Moreover, the officers informed Alfaro that she did not have to remain, and that she was free to leave when she wished.  The Court concludes that she understood these statements.  These were not empty words, given that the officers honored Alfaro's request to end the questioning so that she would have time to attend a birthday party later that evening.  Alfaro has pointed out that the FBI offices were several miles from her neighborhood and that, as a practical matter, she was confined, because she would not realistically have been able to leave the office and return home until the

-28-

officers took her.  The Court does not believe that the distance to her home from the FBI office is determinative.  The more important factor here is that, when Alfaro asked to end the meeting so that she could go to the birthday party, the officers complied and dropped her off within a few blocks of her home.

Thus, the period of questioning was not lengthy, and Alfaro was given some control over its duration.  When she was ready to leave, the officers not only allowed her to do so, but took her to where she needed to go.  Under those circumstances, the duration of the questioning and Alfaro's overall time spent with the law enforcement officers does not counsel a finding that Alfaro's statements made during that time were involuntary.

### C.    ALFARO WAS ADVISED OF HER CONSTITUTIONAL RIGHTS AND WAS NOT PUNISHED OR THREATENED DURING THE QUESTIONING.

Benavides testified that, before interviewing Alfaro, and before the other officers conducted questioning, Benavides read a Spanish translation of the <u>Miranda</u> rights to her and explained the rights to her.  Benavides also testified that Alfaro said that she understood those rights.  <u>See</u> Tr. at 54:4-5 (Benavides).  After receiving and explanation of the <u>Miranda</u> rights, Alfaro agreed to answer questions for the officers.  Thus, the facts that Alfaro was informed of her constitutional rights, understood them, and was still willing to speak to the officers, all counsel against finding that Alfaro's statements were made involuntarily.

The setting under which the questioning occurred also suggests that Alfaro spoke voluntarily with the law enforcement officers.  From the time that officers initiated contact, Alfaro was not forced to accompany the law enforcement officers to the FBI office.  When they met her, they told her that she was not obligated to talk to them or accompany them.  <u>See</u> Tr. at 8:18-25 (Nevala).  They also clarified that she was not under arrest.  <u>See</u> <u>id.</u> at 23:21 (Nevala).  Nevertheless, Alfaro

agreed to accompany them.  See id. at 32:3-4 (Camacho, Nevala).

The FBI office to which Alfaro was taken does not have the look of a detention facility.  It lies in a bank building and does not contain holding cells.  Although the officers showed their credentials to Alfaro to identify themselves as law enforcement, the officers were dressed in plain clothes, and they had their weapons out of sight.  They also told her various times that she was not under arrest.

Rather than creating an ambiance suggestive of an attempt "to sap . . . [Alfaro's] powers of resistance and self-control," Culombe v. Connecticut, 367 U.S. at 603, the officers made considerable effort to assure that Alfaro was comfortable during the time that they questioned her. The officers questioned Alfaro in the break room of the FBI office.  The break room was furnished with a television and a with a refrigerator stocked with snacks.  During the questioning, the officers refrained from raising their voices, threatening, striking, or restraining Alfaro.  They offered her snacks and drinks, and they allowed her to use the restroom when she needed to do so.  The officers also honored Alfaro's request to drop her off when she informed them that she needed to leave to attend a birthday party.  These facts and circumstances indicate that there was no punishment inflicted on Alfaro.  The Court therefore finds, after considering both Alfaro's personal characteristics and the details surrounding the questioning to which she was subject, that Alfaro spoke voluntarily with officers, and that she was not coerced.

In conclusion, the Court finds that, while it need not decide whether Alfaro was in custody for purposes of determining whether Miranda warnings were mandatory, Miranda warnings were given, and Alfaro had the right to assistance of counsel and the right to remain silent.  The Court also finds that Alfaro did not make a clear, unambiguous request for an attorney.  Alfaro's statements to the officers following her acknowledgment that she understood her rights were made

voluntarily.  The officers were therefore not required to stop questioning.  In light of the Court's findings, the Court will not suppress Alfaro's statements made to Nevala, Brackeen, and Benavides.

   **IT IS ORDERED** that the Defendant's Motion to Suppress Statement and Memorandum in Support Thereof is denied.  The evidence that is the subject of this motion, and which the United States wishes to present, will be admissible at trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gregory J. Fouratt
   United States Attorney
Albuquerque, New Mexico

 - and -

Renee Camacho
   Assistant United States Attorney
Las Cruces, New Mexico

        *Attorneys for the Plaintiff*

Bernadette Sedillo
Las Cruces, New Mexico

        *Attorney for the Defendant*